# IN THE UNITED STATES BANKRUPTCY COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| In re | ) Case No. 21-40540-399 |
| | ) [Motion for Joint Administration Pending] |
| MISSOURI JACK, LLC, et al. | ) |
| | ) Chapter 11 |
| | ) Hon. Barry S. Schermer |
| Debtor and Debtor in Possession. | ) |
| | ) Hearing Date: February 19, 2021 |
| | ) Hearing Time: 10:00 a.m. |

**EMERGENCY FIRST-DAY MOTION BY
MISSOURI JACK, LLC AND ILLINOIS JACK, LLC FOR ORDER
(A) AUTHORIZING INTERIM USE OF CASH COLLATERAL, (B) GRANTING
ADEQUATE PROTECTION FOR USE OF PREPETITION COLLATERAL,
(C) GRANTING RELATED RELIEF, AND (D) SETTING HEARING AND
ESTABLISHING DEADLINES ON FINAL USE OF CASH COLLATERAL**

Missouri Jack, LLC and Illinois Jack, LLC (together, "**Debtors**"), by and through their undersigned counsel, file the within Emergency First-Day Motion for Order (A) Authorizing Interim Use of Cash Collateral, (B) Granting Adequate Protection for Use of Prepetition Collateral, (C) Granting Related Relief, and (D) Setting Hearing and Establishing Deadlines on Final Use of Cash Collateral ("**Motion**") pursuant to Sections 105(a), 361, and 363 of title 11 of the United States Code ("**Bankruptcy Code**"), Rules 4001, 6003(b), and 9014 of the Federal Rules of Bankruptcy Procedure ("**Bankruptcy Rules**"), and the Local Bankruptcy Rules for the Eastern District of Missouri ("**Local Bankruptcy Rules**"). Debtors have separately filed a *Declaration of Hamid Sharafatian in Support of Debtors' Emergency First-Day Motions* that contains evidence in support of this Motion and is therefore incorporated herein by reference.

**I.      INTRODUCTION**

1.      The three related debtors are Missouri Jack, LLC, a Missouri limited liability company ("**MoJack**"), Illinois Jack, LLC, an Illinois limited liability company ("**IlJack**," and together with MoJack, "**Debtors**"), and Conquest Foods, LLC, a Delaware limited liability

company ("**Conquest**"). Conquest is the sole member of MoJack and IlJack. The sole manager of MoJack and IlJack is TNH Partners, LLC, a California limited liability company ("**TNH**"). TNH is also the sole managing member of Conquest.

2. Debtors collectively own and operate 70 Jack in the Box restaurants throughout Missouri and Illinois pursuant to various franchise and related agreements ("**Franchise Documents**") with Jack in the Box Inc., a Delaware corporation, and its affiliated entities (collectively, together with any of their assignees, "**JIB**"). Debtors collectively employ 1,660 active full and part time employees, of which MoJack employs 1,338 and IlJack employs 332.

3. MoJack's principal place of business is located at 13768 Shoreline Drive, Earth City, Missouri, 63045. Pursuant to the Franchise Documents, MoJack currently owns and operates 57 Jack in the Box restaurants in Missouri ("**MoJack Franchise Restaurants**").

4. IlJack's principal place of business is also located at 13768 Shoreline Drive, Earth City, Missouri, 63045. IlJack is also a party to the Franchise Documents, pursuant to which it currently owns and operates 13 Jack in the Box restaurants in Illinois ("**IlJack Franchise Restaurants**," and, together with the MoJack Franchise Restaurants, "**Franchise Restaurants**").

5. Conquest is a co-franchisee of the Franchise Restaurants under the Franchise Documents. Conquest is also a co-borrower under a loan from City National Bank ("**CNB**") (Debtors' largest creditor apart from JIB), and a co-defendant in a lawsuit filed by CNB (discussed below). Conquest does not have operations or employees of its own, and its primary assets are its membership interests in Debtors and its rights under the Franchise Documents.

6. Debtors and Conquest filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code on February 16, 2021 ("**Petition Date**") and have filed a motion in this case seeking joint administration of their cases. Debtors and Conquest filed Chapter 11 to finalize and

#2649030v1                                        2

implement a restructuring agreement that has been negotiated with JIB and to reorganize their financial affairs. This Motion is one of several first-day motions being filed by Debtors.[1]

7. No trustee has been appointed in either of Debtors' cases, and Debtors are operating their businesses and managing their assets as debtors in possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

8. The relief requested herein is necessary and appropriate because Debtors' primary source of cash is derived from the day-to-day business operations of the Franchise Restaurants. In order for business operations to continue uninterrupted and to generate funds in support of the overall reorganization strategy, Debtors must be able to continue to use the cash generated daily from such business. By filing this Motion, Debtors are neither conceding nor consenting that all of the cash generated by the operations of Debtors' business constitutes the cash collateral of the Secured Parties identified herein.

**II.    CONCISE STATEMENT OF RELIEF REQUESTED IN THIS MOTION**

9. The following summary is provided pursuant to Bankruptcy Rule 4001(b)(1)(B):

**(1)    The name of each entity with an interest in cash collateral:**

- JIB

- CNB (which secured interest is disputed as discussed below)

- Meadowbrook Meat Company, Inc., a subsidiary of McLane Company, Inc. ("**McLane**")

- Trinity & Bowman Holdings, LLC, a California limited liability company ("**Trinity**," and together with CNB, JIB, and McLane, "**Secured Parties**")

---

[1] In addition to the first-day motions that have been filed, Debtors have the following additional "first day" motions that were not completed in time for the emergency filing due to time constraints: (a) honor customer programs, (b) DIP financing, (c) critical vendor, and (d) limiting notice.

**(2)** **The purposes for the use of the cash collateral:**

Debtors seek to use cash collateral (including cash on hand as of the Petition Date and funds generated from the operation of the Franchise Restaurants) in order to fund continued operations, which requires the payment of various ordinary and recurring expenses including, but not limited to, franchise fees, rent, payroll, taxes, and the purchase of food and other supplies.

**(3)** **The material terms, including duration, of the use of the cash collateral:**

Debtors seek authority to use the cash collateral for a period of just over three months, through May 31, 2021, in accordance with the Interim Budgets submitted herewith as ***Exhibits A & B***. On a monthly basis, Debtors seek authority to exceed the aggregate amount of the Interim Budget by twenty percent (20%). Debtors also request that they be authorized to apply any unused amount in one category for each month to any other category on a cumulative basis.

**(4)** **Any liens, cash payments or other adequate protection that will provided to each entity with an interest in the cash collateral, or, if not additional adequate protection is proposed, an explanation of why each entity's interest is adequately protected:**

Debtors submit that the Secured Parties are adequately protected by the continued operations of the Franchise Restaurants in the ordinary course of business, which will generate new cash collateral on a daily basis and will thereby preserve and potentially increase its value as a going concern. However, pursuant to Section 361(2) of the Bankruptcy Code, Debtors propose to grant post-petition replacement liens in their cash collateral, solely to the extent that Debtors' use results in a decrease in the value of such Secured Parties' interest in such cash collateral, with such replacement liens being granted to the Secured Parties to the same extent and with the same validity and priority as the Secured Parties' pre-petition liens, subject to all rights, claims, and defenses of Debtors and their estates, including, but not limited to, the right to contest and/or object to the validity, priority, amount, and extent of the liens and claims of the Secured Parties. Any such replacement lien granted hereunder shall not include rights, claims, or causes of action arising under, or related to, Bankruptcy Code §§ 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and 553.

10. The proposed Order submitted with this Motion does not contain any of the provisions listed in Paragraph 1(a) of this Court's Chapter 11 Guidelines relating to Cash Collateral and Financing Orders.

**III.    JURISDICTION AND VENUE**

11.     The Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334.

12.     This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

13.     The venue of this case and this Motion are proper in this district under 28 U.S.C. §§ 1408 and 1409(a). MoJack is a registered Missouri limited liability company that has both its principal place of business and its principal assets in the Eastern District of Missouri. . IlJack has its principal business office in Missouri. Furthermore, the IlJack and Conquest cases are related to the lead case filed by MoJack. Additionally, this Motion is a proceeding arising in a case under the Bankruptcy Code that is properly commenced in this district.

14.     The statutory and legal predicates for this Motion are Sections 105(a), 507(a), 1107(a), and 1108 of the Bankruptcy Code, Bankruptcy Rules 4001, 6003(b), and 9014, and the Local Bankruptcy Rules.

**IV.    FACTUAL BASIS FOR CASH COLLATERAL MOTION**

15.     An increase in fast food competition contributed to Debtors' financial issues. In 2018, aggressive competitive intrusion into the market not only reduced market share, but also impacted the ability to obtain qualified employees. Competition contributed to raising labor costs and a corresponding decrease in sales. The situation was exacerbated by the COVID-19 pandemic. As a result of economic stress, Debtors fell behind in payments to CNB beginning in 2018. On March 2, 2020, CNB filed a Complaint for Breach of Contract and Claim and Delivery against Debtors and Conquest ("**CNB Complaint**"), seeking over $15 million alleged to be due and owing under the terms of several loans made by CNB to Debtors and Conquest ("**CNB Loan**"). Specifically, the prayer for relief in the CNB Complaint seeks "the amount of at least $15,206,503.37 as of January 13, 2020, plus accrued and accruing interest and default rate

interest from January 13, 2020 through the entry of judgment."

16.     Shortly after the CNB Complaint was filed, the pandemic reached a critical point in the United States, resulting in "stay at home" recommendations and orders that citizens refrain from unnecessary activities outside their homes in an effort to curb transmission of the disease. These restrictions had a further impact on Debtors' businesses at many locations.

17.     JIB, Debtors, and Conquest have been negotiating an out-of-court workout for nearly a year, and those negotiations have resulted in a proposal by JIB whereby, among other concessions, Debtors will be able to close 7 or 8 unprofitable locations without defaulting under the Franchise Documents, and JIB will permit assumption of such agreements and allow Debtors to proceed with reorganization. JIB has also agreed to additional modifications to the Franchise Documents that will enhance Debtors' efforts to reorganize.  Unfortunately, Debtors have been unable to reach agreement with CNB despite diligent efforts to do so (although the parties have tentatively agreed to attend mediation after the filing of the Chapter 11 cases).

18.     The CNB Complaint alleges that the CNB Loan is secured by a blanket lien on all of Debtors' assets, including the proceeds thereof.  However, CNB's filed UCC-1 financing statements against Debtors, which were filed between February 20, 2014 and March 4, 2014, lapsed in 2019 without CNB having filed UCC-3 continuation statements, and CNB has not filed any new financing statements against Debtors in connection with the CNB Loan. Accordingly, CNB is currently unperfected as to Debtors, and Debtors intend to file an adversary proceeding to avoid CNB's asserted liens for the benefit of their estates using their strong-arm powers under Section 544(a)(1) of the Bankruptcy Code. S*ee, e.g., General Elec. Cap. Corp. v. Dial Bus. Forms, Inc. (In re Dial Bus. Forms, Inc.)*, 341 F.3d 738, 741 (8th Cir. 2003) ("Under the Missouri UCC, a filed financing statement is effective for five years and then lapses unless a continuation

statement has been filed. Upon lapse, the security interest 'is deemed to have been unperfected as against a person' holding an existing security interest."); *Ratcliff v. Rancher's Legacy Meat Co.*, 2020 U.S. Dist. LEXIS 127276, *34-35 (D. Minn. July 20, 2020) ("If the debtor-in-possession as hypothetical lien creditor takes priority over the secured creditor who does not perfect his security interest before commencement of chapter 11 proceedings, then the debtor-in-possession may avoid that creditor's security interest by exercising its Section 544(a) strong-arm powers."). In the meantime, Debtors intend to seek a consensual agreement with CNB for interim use of cash collateral, without waiver of their rights. However, Debtor is uncertain as of this moment whether CNB will oppose the relief sought.

19. JIB asserts a blanket lien in all of Debtors' assets used in connection with the Franchise Restaurants, including the proceeds of such assets, and Debtors believe that it will consent to their proposed use of its cash collateral as set forth herein.

20. McLane asserts a lien in all inventory of Debtors purchased from McLane, together with any and all proceeds of such inventory. Because of the flurry of activity surrounding the bankruptcy filing, Debtors have not yet had an opportunity to discuss the use of cash collateral with McLane prior to the filing of this Motion and are therefore uncertain as to what position McLane will take with respect to the use of cash collateral.

21. Trinity asserts a blanket lien in all of Debtors' assets, including the proceeds thereof, and has consented to Debtors' use of its cash collateral as set forth herein.

## V.    THIS COURT SHOULD AUTHORIZE DEBTORS' USE OF CASH COLLATERAL ON AN INTERIM BASIS

### A.    Applicable Legal Framework

22. Section 363(c)(2) of the Bankruptcy Code provides in relevant part that a debtor in possession may not use cash collateral unless "each entity that has an interest in such cash

collateral consents" or "the court, after notice and a hearing, authorizes such use." 11 U.S.C. § 363(c)(2). *See also In re Grooters Feedlot, LLC*, 2018 Bankr. LEXIS 1338, *10 (Bankr. N.D. Iowa, May 1, 2018). "On request of a party with an interest in cash collateral, the court must prohibit or condition a debtor's use of cash collateral 'as is necessary to provide adequate protection of such interest.'" *Id.* (*quoting* 11 U.S.C. § 363(e)).

23. Although "adequate protection" is not specifically defined in the Bankruptcy Code, Section 361 provides that when adequate protection is required, it may be provided by making period cash payments or granting an additional or replacement lien to the extent that the debtor's use of cash collateral results in a decrease in the value of the secured party's interest in such property, or granting such other relief "as will result in the realization by such entity of the indubitable equivalent of such entity's interest in such property. 11 U.S.C. § 361.

24. "In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard." *Martin v. United States (In re Martin)*, 761 F.3d 472, 476 (8th Cir. 1985). The 8th Circuit has described the necessary analysis as follows:

> In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

*Id.* at 476-77.

### A. Debtors Have an Immediate Need for Use of Cash Collateral and Have Satisfied the Requirements to Use the Cash Collateral on an Interim Basis

25. Debtors' ability to pay their employees and to otherwise maintain their day-to-day operations without disruptions is essential to continued viability of the businesses and Debtors' ability to reorganize. Hiring and retaining qualified employees has been particularly challenging during the pandemic, and the ability to continue to meet payroll on a timely basis is critical to

#2649030v1                                              8

Debtors' ability to retain their workforce. Debtors' need to use cash collateral is both critical and immediate, and in the absence of authorization to use cash collateral, there will be serious and irreparable harm to Debtors, their estate, their employees, and Debtors' ability to reorganize.

26. Debtors' use of cash collateral is necessary both to preserve the going concern value of the business and to reduce post-petition administrative expense claims against Debtors, issues that are vitally important to a successful reorganization. Debtors have developed cash flow projections reflecting anticipated revenue and expenditures from the Petition Date through May 31, 2021, which are contained in proposed Interim Budgets ("**Interim Budgets,**" true and correct copies of which are submitted herewith as *Exhibit A* for MoJack and *Exhibit B* for IlJack). As set forth in the Interim Budgets, Debtors seek authority to use cash on hand as of the Petition Date together with funds generated from the post-petition operation of the Franchise Restaurants.

27. Debtors have an immediate need for the use of asserted cash collateral to maintain their business operations. Debtors' expected use of cash collateral during the interim period is reflected in the Interim Budgets. All payments described in the Interim Budgets are necessary to maintain and continue Debtors' operations and to preserve their going concern value for the benefit of Debtors' creditors. Significantly, Debtors must remain current in their payments to JIB under the Franchise Documents, as the loss of their franchise rights would cause irreparable damage to the Secured Parties' collateral. Additionally, Debtors must have access to cash collateral to make payments to their employees and vendors for post-petition goods and necessary services, including, among others, food and related supplies, rent, utilities, payroll, payroll tax, sales and other taxes, insurance, and other operating expenses and pertinent, ordinary expenses of their businesses. Failure to make payments in accordance with the Interim Budgets

would likely result in the cessation or interruption of Debtors' business, causing immediate and irreparable harm to their estates. Put simply, Debtors cannot continue operations without the use of cash collateral, and if Debtors are unable to operate, all parties will be harmed. Debtors also seek authority to pay their professionals necessary for this reorganization and to permit such payments to be made in accordance with the Local Bankruptcy Rules and established guidelines.

28. Although Debtors do not concede or agree that all of the cash generated by the Franchise Restaurants is the cash collateral of the Secured Parties (particularly in the case of CNB), by this Motion, Debtors seek to use cash derived from the business operations on an interim basis, in accordance with the Interim Budgets. Debtors further seek final use of cash collateral in accordance with the budgets to be filed prior to the final hearing.

29. Inasmuch as the proposed expenditures are projections, there may be some variation in the categories of expenditures as well as unanticipated expenses, particularly on an interim basis. For example, it is not possible to predict at this time the effect, if any, that this Chapter 11 filing may have on Debtors' businesses in the short term, although little, if any, impact is anticipated. Therefore, on a monthly basis, Debtors seek authority to exceed the aggregate amount of the Interim Budgets by twenty percent (20%). Further, Debtors request that they be authorized to apply any unused amount in one category for each month to any other category on a cumulative basis.

B. **The Secured Parties Have the Burden of Establishing the Validity, Priority, and Extent of their Claimed Liens and Are Adequately Protected**

30. While Debtors have the burden of proving adequate protection, "an entity asserting an interest in property has the burden of proof on the issue of the validity, priority, or extent of such interest." *VanCura v. Hanrahan (in re Meill)*, 441 B.R. 610, 613 (8th Cir. B.A.P. 2010) (quoting 11 U.S.C. § 363(p)(2)). If this Court determines that Debtors' cash proceeds are

#2649030v1                                                    10

the cash collateral of CNB (which Debtors dispute) and/or the other Secured Parties, the Court should find that the Secured Parties are adequately protected, and Debtors should therefore be authorized to use such cash collateral in accordance with the Interim Budgets.

31. A debtor's cash "is the life's blood of the business," and a bankruptcy court must assure that such life blood "is available for use even if to a limited extent." *In re Mickler,* 9 B.R. 121, 123 (Bankr. M.D. Fla. 1981). "[A]nyone familiar with reorganization proceedings knows that if a Debtor who seeks relief under Chapter 11 is deprived of the use of cash, its chances to secure rehabilitation is immediately destroyed and very few, if any, entities could survive and effectuate a reorganization without cash." *Id.* Thus, if a secured creditor does not consent to the use of its cash collateral, a bankruptcy court can authorize the debtor in possession to use such cash collateral under Section 363(c)(2)(b) of the Bankruptcy Code if it determines that the debtor has provided "adequate protection" of the secured creditors' interest in the cash collateral.

32. The key question is whether the value of the Secured Parties' collateral is decreasing and whether the proposed form of adequate protection provides such creditors with the indubitable equivalent of such entities' interest in the property. Debtors' business is seasonal, and while cash revenues are currently at a low point, they are expected to rise month by month as operations move into the spring and summer months. Accordingly, by continuing to operate in the normal course, Debtors anticipate that their cash collateral position will only improve, thereby improving Debtors' overall going concern value.

33. Adequate protection is provided by virtue of the Debtors' proposed use of their cash collateral, which is to continue operations of the Franchise Restaurants as going concerns. Allowing Debtors to use cash collateral to finance their ongoing operations will preserve and enhance the Secured Parties' collateral. The value of Debtors' assets is enhanced by continued

operation in their highest and best use as restaurants, as well as the goodwill associated with Debtors' businesses. Debtors' ability to maximize the value of these assets is inextricably tied to maintaining the going concern value of the Franchise Restaurants, which in turn is dependent on having cash available to pay for operating expenses. The Franchise Restaurants are Debtors' primary assets, and without continuity of operations and an uninterrupted ability to conduct business, Debtors could face significant customer defection, which would have an immediate and devastating effect upon Debtors' future revenues, creditors, employees, and opportunity for reorganization.

34. If Debtors do not have access to cash to pay their operating expenses, even for a short amount of time, they will, in all likelihood, be forced to shut down, which would irreparably harm the fair value. As such, the use of cash collateral (including all cash existing on the Petition Date plus all post-petition revenue generated) to conduct Debtors' business will not only preserve and protect the value of the Secured Parties' collateral generally – thus providing the Secured Parties with adequate protection of their interests – it will enhance and maximize the potential recovery fore all creditors of Debtors' estates.

35. It is well established that a bankruptcy court, where possible, should resolve issues presented to it in favor of reorganization rather than force a liquidation because the business cannot use cash or other property. *See In re Bonnet Mall Partnership*, 2 F.3d 899, 915 (9th Cir. 1993) ("Chapter 11 has two major objectives 1) to permit successful rehabilitation of debtors and 2) to maximize the value of the estate."); *In re Dynaco Corp.*, 162 B.R. 389, 394 (Bankr. D. N.H, 1993) ("[T]he purpose of Chapter 11 is to rehabilitate debtors and generally access to cash collateral is necessary in order to operate a business.") (*quoting In re Stein*, 19 B.R. 458, 459 (Bankr. E.D. Pa. 1982)); *In re Prime, Inc.*, 15 B.R. 216, 219 (Bankr. W.D. Mo.

1981) ("[I]t is apparent that congress intended business under reorganization to proceed in as normal a fashion as possible."); *In re Hoffman*, 51 B.R. 42, 47 (Bankr. W.D. Ark, 1985) ("The bankruptcy court, where possible, should resolve issues in favor of reorganization."); *In re Heatron, Inc.*, 6 B.R. 493, 496 (Bankr. W.D. Mo. 1980) ("The policy of the Code, as was that of the predecessor statutes, is to encourage reorganization if there is a reasonable possibility of success.") As the *Heatron* court stated, granting a debtor's motion to use cash collateral, "[a]t the beginning of the reorganization process, the Court must work with less evidence than might be desirable and should resolve issues in favor of the reorganization where the evidence is conflicting." *Id.* See also In re A&B Heating & Air Conditioning, Inc., 48 B.R. 401,403-04 (Bankr. M.D. Fla. 1985) (same).

36.     In *In re O'Connor*, 808 F.2d 1393 (10th Cir. 1987), the court summarized the foregoing principle as follows:

> In this case, Debtors, in the midst of a Chapter 11 proceeding, have proposed to deal with cash collateral for the purpose of enhancing the prospects of reorganization. The quest is the ultimate goal of Chapter 11. Hence, the Debtors' efforts are not only to be encouraged, but also their efforts during the administration of the proceeding are to be measured in light of that quest. Because the ultimate benefit to be achieved by a successful reorganization inures to all the creditors of the estate, a fair opportunity must be given to the Debtors to achieve that end.
>
> \*\*\*
>
> In order to encourage the Debtors' efforts in the formative period prior to the proposal of a reorganization, the court must be flexible in applying the adequate protection standard.

808 F.2d at 1397-98. This principle applies equally to efforts to realize the highest value through going concern value.

37.     Applying the foregoing, courts have frequently allowed a debtor to use cash collateral in circumstances where such use would enhance or preserve the value of the collateral.

For example, in *In re Stein*, 19 B.R. 458 (Bankr. E.D. Pa. 1982), the court allowed a debtor to use cash collateral even where the secured party was under secured and had no equity cushion for protection. The court in *Stein* found that the use of cash collateral was necessary for the continued operations of the debtor and the creditor's "secured position can only be enhanced by the continued operation of the [debtor's business]." *Id*. at 460. *See also In re Pine Lake Village Apt. Co.*, 16 B.R. 750 (Bankr. S.D.N.Y. 1982) (permitting debtor to use cash collateral generated from rental income to enhance the value of real property and secured creditor's claim). "The Court is not obligated to protect the creditor better than it did itself when making the loan and obtaining security." *Id*. (*citing In re Heatron*, 6 B.R. at 496).

38.     Where, as here, the continuation of Debtors' businesses preserves the value of the Secured Parties' collateral, Debtors' continued operations constitute adequate protection of the Secured Parties' interests in the collateral. In the event, however, that there is any diminution in the post-petition value of Debtors' cash collateral, pursuant to Section 361(2) of the Bankruptcy Code, Debtors propose to grant post-petition replacement liens in their cash collateral, solely to the extent that Debtors' use results in a decrease in the value of such Secured Parties' interest in such cash collateral, with such replacement liens being granted to the same extent and with the same validity and priority as the Secured Parties' pre-petition liens, subject to all rights, claims, and defenses of Debtors and their estates, including, but not limited to, the right to contest and/or object to the validity, priority, amount, and extent of the liens and claims of the Secured Parties. Any such replacement lien granted hereunder shall not include rights, claims, or causes of action arising under, or related to, Bankruptcy Code §§ 105, 506(c), 542, 543, 544, 545, 547, 548, 549, 550, 551, 552, and 553.

      C.      **Debtors Have Satisfied the Requirements for Emergency and Interim Use of Cash Collateral**

39. Section 363(c)(3) of the Bankruptcy Code provides that a bankruptcy court may hold a preliminary motion on a motion to use cash collateral and that such motion "shall be scheduled in accordance with the needs of the debtor." It further provides that the "court shall act promptly on any request for authorization" to use cash collateral pursuant to Section 363(c)(2)(B). 11 U.S.C. § 363(c)(3).

40. The authorization to use cash collateral pending a final hearing will preserve the value of Debtors' businesses only if authorization is granted immediately. Section 363(c)(3) and Bankruptcy Rule 4001(b)(2) require this Court to schedule a cash collateral hearing in accordance with Debtors' needs and to conduct a preliminary hearing for the purpose of authorizing the use of cash collateral to avoid irreparable harm. In the present case, emergency use of cash collateral by Debtors pending a final hearing is necessary to prevent irreparable harm to Debtors.

41. On the other hand, the Secured Parties will suffer little, if any, harm if interim relief is granted. To the extent that CNB has an interest in property of Debtors' estates that is worthy of adequate protection, that interest is adequately protected by the preservation of the value of its collateral through Debtors' continued business operations. Shutting down business operations would result in immediate and irreparable harm to Debtors' estates, employees, and creditors. Because the recovery to all creditors will be maximized by the preservation of the going concern value and maintenance of Debtors' business operations, Debtors urgently need access to the cash collateral to work toward their goals in these Chapter 11 cases. As such, the use of cash collateral should be authorized on an interim basis pending a final hearing.

42.     Notice of this Motion is being provided to the Secured Parties identified herein, as well as the Debtors' 20 largest unsecured creditors. Debtors have also provided the Office of the U.S. Trustee with at least 24 hours' notice prior to the filing of this Motion and has provided the United States Trustee with a courtesy copy of the Motion.  Debtors submit that such notice is appropriate and adequate pursuant to Bankruptcy Rule 4001 and the Local Bankruptcy Rules.

WHEREFORE, based on the foregoing, Debtors respectfully requests that this Court enter an Order, substantially in the form to be submitted by the Debtors, approving and authorizing the emergency interim use of cash collateral for a period from the Petition Date through and including May 31, 2021, setting a final hearing thereon, and granting such other and further relief as this Court deems just and proper under the circumstances.

Dated:  February 16, 2021        LEECH TISHMAN FUSCALDO & LAMPL, INC.

Sandford L. Frey #117058CA
Leech Tishman Fuscaldo & Lampl, Inc.
200 South Los Robles Avenue, Suite 300
Pasadena, CA 91101
(626) 796-4000
sfrey@leechtishman.com

[Proposed] Reorganization Attorneys for
Missouri Jack, LLC, Illinois Jack, LLC, and
Conquest Foods, LLC,
Debtors and Debtors in Possession
***Pro Hac Vice Admission pending***

Respectfully Submitted,

Date: February 16, 2021        SUMMERS COMPTON WELLS LLC
By     /s/   David A Sosne
David A. Sosne (#28365MO)
Brian J. LaFlamme (#49776MO)
Seth A. Albin (#46483MO)
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999

#2649030v1                                                        16

(314) 991-2413 Fax
Email:
dasattymo@summerscomptonwells.com
blaflmme@summerscomptonwells.com
salbin@summerscomptonwells.com

[Proposed] Reorganization Attorneys for
Missouri Jack, LLC, Illinois Jack, LLC, and
Conquest Foods, LLC,
Debtors and Debtors in Possession

#2649030v1                                    17