IN THE UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| In re | ) Case No. 21-40540-399 |
| | ) [Motion for Joint Administration Pending] |
| MISSOURI JACK, LLC, et al. | ) |
| | ) Chapter 11 |
| | ) Hon. Barry S. Schermer |
| Debtor and Debtor in Possession. | ) |
| | ) Hearing Date:  February 19, 2021 |
| | ) Hearing Time: 10:00 a.m. |

**DECLARATION OF HAMID SHARAFATIAN IN SUPPORT OF
DEBTORS' EMERGENCY FIRST-DAY MOTIONS**

I, Hamid Sharafatian, declare as follows:

1. I have personal knowledge of the matters set forth herein, and if called upon as a witness to testify thereto, I could and would competently so testify to those matters, except as to those matters expressly stated to be made on information and belief.

2. I am a representative of debtors and debtors in possession Missouri Jack, LLC ("**MoJack**"), Illinois Jack, LLC ("**IlJack**," and together with MoJack, the "**Debtors**"), and Conquest Foods, LLC ("**Conquest**").

A. **Background of the Debtors, Conquest, and the Chapter 11 Filings**

3. MoJack is a Missouri limited liability company with its principal place of business located at 13768 Shoreline Drive, Earth City, Missouri, 63045

4. IlJack is an Illinois limited liability company with its principal place of business located at 13768 Shoreline Drive, Earth City, Missouri, 63045.

5. Conquest is a Delaware limited liability company. Conquest is the sole member of MoJack and IlJack.

6.     The sole manager of MoJack and IlJack is TNH Partner, LLC, a California limited liability company ("**TNH**"). TNH is also the sole managing member of Conquest.

7.     The Debtors collectively own and operate 70 Jack in the Box restaurants throughout Missouri and Illinois pursuant to various franchise and related agreements (the "**Franchise Documents**") with Jack in the Box Inc., a Delaware corporation, and its affiliated entities (collectively, together with any of their assignees, "**JIB**"). MoJack currently owns and operates 57 Jack in the Box restaurants in Missouri, and IlJack currently owns and operates 13 Jack in the Box restaurants in Illinois (the "**Franchise Restaurants**").

8.     The Debtors collectively employ 1,660 active full and part time employees, of which MoJack employs 1,338 and IlJack employs 332.

9.     Conquest is a co-franchisee of the Franchise Restaurants under the Franchise Documents. Conquest is also a co-borrower under a loan from City National Bank ("**CNB**") (the Debtors' largest creditor apart from JIB), and a co-defendant in a lawsuit filed by CNB (discussed below). Conquest does not have operations or employees of its own, and its primary assets are its membership interests in the Debtors and its rights under the Franchise Documents.

10.    The Debtors' primary source of cash is derived from the day-to-day business operations of the Franchise Restaurants. In order for business operations to continue uninterrupted and to generate funds in support of the overall reorganization strategy, the Debtors must be able to continue to use the cash generated daily from such business.

11.    I authorized a search by a lien search company of any UCC filings with the Secretary of State's offices in Delaware, Illinois, and Missouri for the Debtors and Conquest. The rests of that search are attached hereto as ***Exhibit 1***.  The following creditors were listed as having outstanding UCC-1 financing statements against the Debtors and Conquest that have not

#2649280v1                                2

been terminated: JIB, (against MoJack and IlJack), Meadowbrook Meat Company, Inc., a subsidiary of McLane Company, Inc. ("**McLane**") (against MoJack and IlJack), and CNB (against Conquest).

12. In addition, on February 11, 2021, the Debtors and Conquest entered into new secured loans with Trinity & Bowman Holdings, LLC, a California limited liability company ("**Trinity**").

13. The Debtors are in the business of operating the Franchised Restaurants.

14. An increase in fast food competition contributed to the Debtors' financial issues. In 2018, aggressive competitive intrusion into the market not only reduced market share, but also impacted the ability to obtain qualified employees. In recent years, Missouri ranked 4.9 per capita for fast food restaurants and St. Louis, Missouri ranked 11.9 per capita. Competition contributed to raising labor costs and a corresponding decrease in sales. The situation was exacerbated by the COVID-19 pandemic.

15. As a result of economic stress, the Debtors fell behind in payments to CNB beginning in 2018. On March 2, 2020, CNB filed a Complaint for Breach of Contract and Claim and Delivery against the Debtors and Conquest (the "**CNB Complaint**"), seeking over $15 million alleged to be due and owing under the terms of several loans made by CNB to the Debtors and Conquest (the "**CNB Loan**"). Specifically, the prayer for relief in the CNB Complaint seeks "the amount of at least $15,206,503.37 as of January 13, 2020, plus accrued and accruing interest and default rate interest from January 13, 2020 through the entry of judgment."

16. Shortly after the CNB Complaint was filed, the pandemic reached a critical point in the United States, resulting in "stay at home" recommendations and orders that citizens refrain from unnecessary activities outside their homes in an effort to curb transmission of the disease. These restrictions had a further impact on the Debtors' businesses at many locations.

17. I have actively participated in negotiations with JIB. JIB, the Debtors, and Conquest have been negotiating an out-of-court workout for nearly a year, and those negotiations have resulted in a proposal by JIB whereby, among other concessions, the Debtors will be able to close 7 or 8 unprofitable locations without defaulting under the Franchise Documents, and JIB will permit assumption of such agreements and allow the Debtors to proceed with reorganization. JIB has also agreed to additional modifications to the Franchise Documents that will enhance the Debtors' efforts to reorganize. Unfortunately, the Debtors have been unable to reach agreement with CNB despite efforts to do so, although the parties have tentatively agreed to attend mediation after the filing of the Chapter 11 cases.

  C. **Joint Administration**

18. The Debtors' operations are interconnected and co-dependent, sharing common ownership, operating in a similar geographic area, and sharing essentially all of the same creditors and other parties in interest.

19. Many of the motions, hearings, and orders that will arise in the Chapter 11 Cases will affect all of the Debtors, or at least IlJack and MoJack. Thus, the entry of an order directing the joint administration of the Chapter 11 cases will reduce administrative fees and costs by, for example, avoiding the necessity of filing duplicate motions and objections.

20. The Debtors are seeking only procedural, and not substantive, consolidation of their estates.

21. JIB, City National Bank and Trinity & Bowman Holdings, LLC are creditors of all three of the Debtors, and there is a unity among the unsecured creditors of MoJack and IlJack.

### D. Extension of Time to File Schedules and Statements of Financial Affairs

22. The Debtors did not initially intend to file for Chapter 11 at least until after they had reached agreements with both JIB and CNB. Unfortunately, the Debtors have been unable to reach agreement with CNB despite diligent efforts to do so (although the parties have tentatively agreed to attend mediation after the filing of the Chapter 11 cases). In the meantime, aggressive litigation by CNB, mounting financial and landlord pressure, and other factors caused these filings earlier than anticipated. Accordingly, the Debtors did have as much time as they would have hoped to prepare for these filings in advance.

23. The Debtors and Debtors' proposed counsel have been devoting substantial time and effort to organizing information necessary for the petitions and for preparation of numerous first-day motions, and additional urgent motions are anticipated in the early stages of these cases.

24. Given the numerous other pleadings the Debtors are filing, and those they have yet to file, and compliance requirements of Office of the U.S. Trustee, the Debtors need additional time to complete and file their Schedules of Assets and Liabilities (the "**Schedules**"), Statements of Financial Affairs (the "**SOFAs**"), and any other documents required to be filed pursuant to any Case Management Deficiency Notices or other similar notices issued by the Court (collectively with the Schedules and SOFAs, the "**Required Documents**")

25. The Debtors do not believe that the extension of time materially prejudices the rights of any parties. On balance, affording the Debtors sufficient time to file the Required

#2649280v1                                    5

Documents will likely alleviate the necessity of future amendments, and hopefully avoid additional expenditure of unnecessary administrative expenses incurred in connection with same.

26. To prepare the Required Documents, the Debtors must compile information from books, records, and documents relating to the claims of the Debtors' numerous creditors, as well as the Debtors' many assets and contracts. This information is extensive, and collecting it requires an enormous expenditure of time and effort on the part of the Debtors, their employees, and their professionals.

27. Since the filing of their petitions, the Debtors have been assisting in the preparation of their emergency motions and working toward complying with their various bankruptcy related obligations. It is imperative for the Debtors to devote their attention toward the emergency first-day motions relating to the continued operation of their businesses, including, but not limited to, motions relating to cash collateral, cash management, utilities, and payment of employee wages, as well as motions in furtherance of administration, such as joint administration and employment of professionals.

28. The need for the requested extension is not the result of a lack of due diligence on the part of the Debtors or their proposed counsel.

29. The Debtors are working diligently to prepare the Required Documents. However, due to the amount of work necessary to complete the Required Documents, and the time needed to assist in other matters critical to the Debtors' reorganization efforts, the Debtors require additional time beyond the required fourteen (14) day period to complete the Required Documents properly and accurately. The Debtors anticipate that they will need at least twenty-one (21) additional days to complete the Required Documents,

**E.  Cash Collateral**

30.  The CNB Complaint alleges that the CNB Loan is secured by a blanket lien on all of the Debtors' assets, including the proceeds thereof. However, CNB's filed UCC-1 financing statements against MoJack and IlJack, which were filed between February 20, 2014 and March 4, 2019, lapsed in 2019 without CNB having filed UCC-3 continuation statements, and CNB has not filed any new UCC-1 financing statements against the Debtors in connection with the CNB Loan. Accordingly, CNB is currently unperfected as to the Debtors, and the Debtors intend to file an adversary proceeding to avoid CNB's asserted liens for the benefit of their estates using their strong-arm powers under Section 544(a)(1) of the Bankruptcy Code.  In the meantime, the Debtors intend to seek a consensual agreement with CNB for interim use of cash collateral, without waiver of their rights. However, the Debtors are uncertain as of this moment whether CNB will oppose the relief sought.

31.  JIB asserts a blanket lien in all of the Debtors' assets used in connection with the Franchise Restaurants, including the proceeds of such assets. The Debtors believe that JIB will consent to the Debtors' proposed use of its cash collateral.

32.  McLane asserts a lien in all inventory of the Debtors purchased from McLane, together with any and all proceeds of such inventory. Because of the flurry of activity surrounding the bankruptcy filing, the Debtors have not yet had an opportunity to discuss the use of cash collateral with McLane prior to the filing of their first-day motions and are therefore uncertain as to what position McLane will take with respect to the  use of cash collateral.

33.  Trinity asserts a blanket lien in all of the Debtor's assets, including the proceeds thereof.  Trinity has consented to the Debtors' use of its cash collateral.

34. The Debtors' ability to pay their employees and to otherwise maintain their day-to-day operations without disruptions is essential to continued viability of the businesses and the Debtors' ability to reorganize. Hiring and retaining qualified employees has been particularly challenging during the pandemic, and the ability to continue to meet payroll on a timely basis is critical to the Debtors' ability to retain their workforce. The Debtors' need to use cash collateral is both critical and immediate, and in the absence of authorization to use cash collateral, there will be serious and irreparable harm to the Debtors, their estates, their employees, and the Debtors' ability to reorganize.

35. The Debtors' use of cash collateral is necessary both to preserve the going concern value of the businesses and to reduce post-petition administrative expense claims against the Debtors, issues that are vitally important to a successful reorganization.

36. The Debtors have developed cash flow projections reflecting anticipated revenue and expenditures from the Petition Date through May 31, 2021, which are contained in proposed Interim Budgets (the "**Interim Budgets**," true and correct copies of which have been submitted with the Debtors' Cash Collateral Motion as *Exhibit A* for MoJack and *Exhibit B* for IlJack). As set forth in the Interim Budgets, the Debtors seek authority to use cash on hand as of the Petition Date together with funds generated from the post-petition operation of the Franchise Restaurants.

37. The Debtors have an immediate need for the use of asserted cash collateral to maintain its business operations. The Debtors' expected use of cash collateral during the interim period is reflected in the Interim Budgets. All payments described in the Interim Budgets are necessary to maintain and continue the Debtors' operations and to preserve their going concern value for the benefit of the Debtors' creditors. Significantly, the Debtors must remain current in

their payments to JIB under the Franchise Documents, as the loss of its franchise rights would cause irreparable damage to the Secured Parties' collateral. Additionally, the Debtors must have access to cash collateral to make payments to their employees and vendors for post-petition goods and necessary services, including, among others, food and related supplies, rent, utilities, payroll, payroll tax, sales and other taxes, insurance, and other operating expenses and pertinent, ordinary expenses of its business. Failure to make payments in accordance with the Interim Budgets would likely result in the cessation or interruption of the Debtors' businesses, causing immediate and irreparable harm to their estates. Put simply, the Debtors cannot continue operations without the use of cash collateral, and if the Debtors are unable to operate, all parties will be harmed.

38. The Debtors also seek authority to pay their professionals necessary for this reorganization and to permit such payments to be made in accordance with the Local Bankruptcy Rules and established guidelines.

39. Although the Debtors do not concede or agree that all of the cash generated by the Franchise Restaurants is the cash collateral of the Secured Parties (particularly in the case of CNB), the Debtors seek to use cash derived from the business operations on an interim basis, in accordance with the Interim Budgets. The Debtors further seek final use of cash collateral in accordance with the budget to be filed prior to the final hearing.

40. Inasmuch as the proposed expenditures are projections, there may be some variation in the categories of expenditures as well as unanticipated expenses, particularly on an interim basis. For example, it is not possible to predict at this time the effect, if any, that this Chapter 11 filing may have on the Debtors' businesses in the short term, although little, if any, impact is anticipated. Therefore, on a monthly basis, the Debtors seek authority to exceed the

aggregate amount of the Interim Budget by twenty percent (20%). Further, the Debtors request that they be authorized to apply any unused amount in one category for each month to any other category on a cumulative basis.

41. The Debtors' business is seasonal, and while cash revenues are currently at a low point, they are expected to rise month by month as operations move into the spring and summer months. Accordingly, by continuing to operate in the normal course, the Debtors anticipate that their cash collateral position will only improve, thereby improving the Debtors' overall going concern values.

42. The Franchise Restaurants are the Debtors' primary assets, and without the continuity of operations and an uninterrupted ability to conduct business, the Debtors could face significant customer defection, which would have an immediate and devastating effect upon the Debtors' future revenues, creditors, employees, and opportunity for reorganization.

43. If the Debtors do not have access to cash to pay their operating expenses, even for a short amount of time, they will, in all likelihood, be forced to shut down, which would irreparably harm their fair value. As such, the use of cash collateral (including all cash existing on the Petition Date plus all post-petition revenue generated) to conduct the Debtors' business will not only preserve and protect the value of the Secured Parties' collateral generally – thus providing the Secured Parties with adequate protection of their interests – it will enhance and maximize the potential recovery for all creditors of the Debtors' estates.

### E.    Utilities

44. Uninterrupted utility services during the reorganization are vital to operation of the Franchise Restaurants and preservation of the going concern value of the Debtors' businesses. In addition, implementation of orderly procedures for utility companies is essential

to cash flow and vitally important to the success of the reorganization.

45. In connection with the operation of their businesses, the Debtors obtain water, sewer service, waste disposal, natural gas, electricity, telecommunications, internet access and service, and other similar services (collectively, the "**Utility Services**") from a number of utility providers (the "**Utility Provider(s)**"). A nonexclusive list of the Utility Providers and their affiliates that provide Utility Services to the Debtors as of the Petition Date is attached to the Debtors' Utility Motion as *__Exhibit A__*.[1] The relief requested herein is requested with respect to all Utility Providers providing Utility Services to the Debtors, regardless of whether they are included on Exhibit A.

46. Preserving Utility Services on an uninterrupted basis is essential to the Debtors' business operations. The Debtors' business includes multiple operating restaurant locations. These locations require electricity, telecommunications, internet, water, waste management, and other utility services to operate.

47. Should any Utility Provider refuse or discontinue service, even for a brief period, the Debtors' business operations would be disrupted, which could jeopardize the Debtors' ability to effectively reorganize. Accordingly, it is essential that the Utility Services continue uninterrupted during this Bankruptcy Case.

48. The Debtors intend to pay post-petition obligations to the Utility Providers in a substantially timely manner consistent with ordinary course practices.

F. **Employee Matters**

49. The Debtors have filed an Emergency First-Day Motion for Authority to (i) Pay Prepetition Wages, Salaries, and Other Compensation and Benefits, (ii) Maintain Employee

---

[1] Although Exhibit A is meant to be comprehensive list, the Debtors may have inadvertently omitted one or more Utility Providers. By their Utility Motion, the Debtors request relief applicable to all Utility Providers, regardless of whether or not such Utility Provider is specifically identified on Exhibit A.

Benefit Programs and Pay Related Administrative Obligations, and (iii) to Authorize Banks to Honor and Process Related Checks and Transfers (the "**Wage Motion**").

50. By way of the Wage Motion, the Debtors seek entry of an Order authorizing the Debtors to pay Employee Obligations, as defined in the Wage Motion, and directing Bank of America to honor any payments for the Employee Obligations.

51. The relief requested in the Wage Motion is necessary to avoid irreparable harm and appropriate because the Debtors require the labor and services of their current employees in order for business operations to continue uninterrupted and to generate funds in support of the overall reorganization strategy. In summary, the Debtors' recent pay period ended on February 15, 2021 (the "**February 15 Pay Period**"), and all current employees are due their earned wages from that period.

52. Without satisfying the Employee Obligations, (as defined in the Wage Motion) the Debtors may lose valuable employees, causing a detrimental interruption in the Debtors' operations. Furthermore, given the current economic conditions and health risks caused by the global COVID-19 pandemic, replacing employees at this time could be difficult if not impossible. Moreover, the failure to receive timely paychecks will result in extreme hardship to employees.

53. The relief sought in the Wage Motion is necessary to avoid irreparable harm, to allow continued operations, and to facilitate achieving the reorganizational goals of these Chapter 11 cases.

54. Accordingly, the Debtors seek authorization to pay outstanding Employee Obligations as set forth on *Schedule 1* to the Wage Motion, and to continue Employee Benefits and pay Employee Benefit Obligations as set forth on *Schedule 2* to the Wage Motion. The

Debtors also seek authorization to continue the Miscellaneous Benefit Programs as to pay the Miscellaneous Benefit Obligations as set forth on ***Schedule 3*** to the Wage Motion.

55.     The Debtors' 1,660 full and part time employees perform a variety of critical functions, including management, administration, maintenance, finance and accounting, human resources, safety, security, procurement and preparation of food related items for ultimate delivery to consumers, and other areas crucial to the Debtors' businesses. The employees are fundamental to the success of the Debtors' businesses and continued operations and, as a result, critical to these chapter 11 cases and the Debtors' reorganization efforts. The Debtors estimate that, as of the Petition Date, the aggregate amount of their unpaid Employee Obligations is approximately $925,000 for MoJack and $225,000 for IlJack, due for the February 15 Pay Period.

56.     The Debtors pay employees' salaries, wages and other compensation (including overtime pay) in exchange for services they provide (the "**Compensation Obligations**). As of the Petition Date, the Debtors estimate that the aggregate amount of unpaid Compensation Obligations accrued prepetition related to the February 15 Pay Period totals approximately $720,000 for MoJack and $168,000 for IlJack.

57.     The Debtors are not seeking authority to pay to any individual any amount in prepetition Compensation Obligations that would exceed the $13,650 priority cap imposed by Section 507(a)(4) of the Bankruptcy Code.

58.     The Debtors uses Payarc to administer payroll for employees and provide related payroll processing, payroll tax reporting, time entry systems, payment preparation, payroll transfer administration and other reporting and administrative services (the "**Payroll Processing Obligations**"). The Debtors typically pay approximately $6,000 for MoJack and $1,000 for

IlJack each pay period for Payroll Processing Obligations.

59. As employers, the Debtors are required by law to withhold from certain employees' salaries, wages, and other compensation amounts related to federal, state, and local income taxes, as well as Social Security and Medicare taxes (collectively, the "**Withholding Taxes**") and to remit them to the appropriate taxing authorities (collectively, the "**Taxing Authorities**"). The Debtors are also required to make payments from their own funds on account of Social Security and Medicare taxes and to pay, based on a percentage of gross payroll (and subject to state-imposed limits), additional amounts to the Taxing Authorities for, among other things, state and federal unemployment insurance (collectively, the "**Employer Payroll Taxes**" and, together with the Withholding Taxes, the "**Payroll Tax Obligations**").

60. As of the Petition Date, the Debtors estimate that they owe approximately $194,000 for MoJack and $54,000 for IlJack in Payroll Tax Obligations relating to the prepetition period

61. The Debtors also process child support garnishments owed by various Employees as part of the Employee Obligations. It is estimated that the Debtors must process approximately $5,000 for MoJack $2,700 and for IlJack (the "**Employees' Child Support Garnishments**") stemming from the February 15 Pay Period. Accordingly, the Debtors seek authorization to process the Employees' Child Support Garnishments as part of the relief sought herein.

62. In addition to the aforementioned payment-related obligations, the Debtors maintain various employment benefit plans and policies for their employees, including health care, vision, dental, and other miscellaneous benefit programs (collectively, the "**Employee Benefits**", and the obligations related thereto, the "**Employee Benefit Obligations**").

#2649280v1                                    14

Participation in the Employee Benefits is at the discretion of each individual employee and varies based on their participation therein.

63.   Medical, dental, vision, and other health care benefits (collectively, the "**Health Care Benefits**") are available to eligible employees of the Debtors. The Health Care Benefits of employees' and the Debtors' contributions (the "**Health Care Benefit Obligations**") are set forth on *Schedule 2* to the Wage Motion. The Debtors seek authorization for payment of the Health Care Benefit Obligations in the approximate amount of $22,000 for MoJack and $ 2,700 for IlJack, that will come due and stem from both employees' and the Debtors' contributions.

64.   The Debtors also maintain additional Employee Benefits including, payment to employee's garnishments, disability insurances, life insurances, and telephone programs which are all funded entirely by "after-tax" employee contributions (collectively the "**Miscellaneous Benefit Programs**").  The Debtors also seek authorization to continue to operate and administer the Miscellaneous Benefit Programs as part of the Employee Benefit Obligations. The approximate amount of the Miscellaneous Benefit Program payments expected to be due related to the February 15 Pay Period (the "**Miscellaneous Benefit Obligations**") is set forth on *Schedule 3* to the Wage Motion.

65.   The Miscellaneous Benefit Obligations are funded exclusively by employee contributions but are administered by the Debtors through Payarc. Accordingly, the Debtors seek authorization to satisfy all unpaid Miscellaneous Benefit Obligations in the approximate amount of $2,300 for MoJack and $150 for IlJack stemming from the February 15 Pay Period.

G. **Bank Accounts and Business Forms**

66. The Debtors have filed an Emergency First-Day Motion for Authority to Maintain Business Forms and Existing Bank Accounts and Related Relief, (the "**Bank Account Motion**"). A list of the Debtors' Bank Accounts is included as ***Schedule 1*** to the Bank Account Motion.

67. By way of the Bank Account Motion, the Debtors seek entry of an Order authorizing the Debtors to continue use of their existing Bank Accounts, as defined below, held at Bank of America, and continue using their existing Business Forms, and directing Bank of America to honor payments, checks, ACH transfers and other Electronic transactions as set forth herein and as otherwise authorized by the Court.

68. The relief requested in the Bank Account Motion is necessary to avoid irreparable harm and appropriate because the Debtors require the ability to use their existing bank accounts, business forms to continue operations, continue paying its suppliers and vendors in the ordinary course of business and to continue to honor its payroll obligations without unnecessary and costly interruption of these functions.

69. In the event, there was an interruption in Debtors' ability to timely remit payment to vendors and suppliers and or timely pay their employees, there is a possibility that vendors and suppliers may discontinue providing goods and services to the Debtors, and employees may cease providing necessary labor to keep the Debtors' businesses operating. Indeed, any interruption in business operations could cause loss of public support and patronage to the Debtors' business which could potentially not be recaptured upon re-installation of operations.

70. Accordingly, the relief sought in the Bank Account Motion is necessary to avoid irreparable harm, to allow continued operations, and to facilitate achieving the reorganizational goals of these Chapter 11 cases.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct, and that this declaration was executed on February 16, 2021 in Los Angeles, California.

/s/ Hamid Sharafatian
Hamid Sharafatian

Dated: February 16, 2021

LEECH TISHMAN FUSCALDO & LAMPL, INC.
SANDFORD L. FREY

Sandford L. Frey #2649280CA
Leech Tishman Fuscaldo & Lampl, Inc.
200 South Los Robles Avenue, Suite 300
Pasadena, CA 91101
(626) 796-4000
sfrey@leechtishman.com

[Proposed] Reorganization Attorneys for
Missouri Jack, LLC, Illinois Jack, LLC, and
Conquest Foods, LLC,
Debtors and Debtors in Possession
***Pro Hac Vice Admission pending***

Respectfully Submitted,

Date: February 16, 2021

SUMMERS COMPTON WELLS LLC
By   /s/  David A Sosne
David A. Sosne (#28365MO)
Brian J. LaFlamme (#49776MO)
Seth A. Albin (#46483MO)
8909 Ladue Road
St. Louis, MO 63124
(314) 991-4999
(314) 991-2413 Fax
Email:
dasattymo@summerscomptonwells.com

blaflmme@summerscomptonwells.com
salbin@summerscomptonwells.com

[Proposed] Reorganization Attorneys for
Missouri Jack, LLC, Illinois Jack, LLC, and
Conquest Foods, LLC,
Debtors and Debtors in Possession

#2649280v1                    18